ARMOND T. HUNT v. WILLIAM R. SHIER, IMPLEADED WITH
ALONZO EATON.

*Fraudulent mortgages.*

On an examination of the testimony the Court held the mortgage fraudulent and reversed the decree of the Superior Court.

Appeal from Superior Court of the City of Detroit. (Chipman, J.) Argued January 12 and 13, 1886. Decided January 20, 1886.

Bill filed to set aside mortgage as fraudulent. Bill dismissed. Reversed, and relief asked for granted.

*Griffin & Warner*, for complainant.

*D. C. Griffen* and *J. Willard Babbitt*, for defendant.

CAMPBELL, C. J.    Complainant Hunt, who is a nominal holder of interests belonging to Mrs. Ellen V. Eaton, obtained a judgment against Alonzo Eaton, on the thirtieth day of June, 1884, for $3,361.48. This suit was begun on the twenty-seventh of February, 1884. On June 18, 1884, an attachment was sued out in the cause, and levied on four lots of land in Detroit, of much less value than the debt. Execution was levied on this land after the perfecting of the judgment.

On the twenty-sixth day of May, 1884, a mortgage was executed to defendant Shier of Ypsilanti, who is a brother-in-law of Eaton, for the sum of $260, to secure a note of the same date, payable in two months. The mortgage does not declare the terms of this obligation. This bill was filed to avoid this mortgage as executed in fraud of complainant as a creditor. The court below dismissed the bill, and complainant appeals.

It appears from the testimony that the alleged consideration of the mortgage was an amount due from Eaton to Shier for a little over one year's board of his daughter, at

five dollars a week. The good faith of this transaction is attacked, and some of the facts bearing on the surroundings of the parties are claimed to be important in determining this controversy. Mrs. Eaton was a second wife of Alonzo Eaton, and had a child of her own, for whom she held some property in her care. Mr. Eaton had a grown-up daughter. Up to the spring of 1883 this daughter and her grandmother had lived with Mr. and Mrs. Eaton, and Mrs. Eaton had advanced to her husband, and for household expenditures, a considerable amount of money, for which the judgment before mentioned was rendered. In the spring of 1883 this young lady and her grandmother went to Ypsilanti to board with defendant, Shier. The grandmother was to be boarded for five dollars a week, and a mortgage had been given on some of Eaton's land some time before to pay this, in case she should be boarded away from his house. Miss Eaton represents that she desired to go to Ypsilanti so as not to be dependent on her stepmother, and that her father authorized her to promise defendant, Shier, that he would pay her board. She lived in Shier's house during the year, giving more or less assistance in family matters. In May, 1884, the mortgage in question was executed, and the only question is whether it was a *bona fide* attempt to secure a good and valid debt, or whether it was a colorable pretext to create a fraudulent incumbrance on property which was already inadequate to pay Mrs. Eaton's claim.

The fact that the careful judge who heard this case below did not conclude that it was fraudulent, has made us especially anxious to satisfy ourselves upon the facts; but, after considering them, we are strongly impressed to the contrary.

It is impossible to read this record without being convinced that there was a vindictive feeling in Eaton against his wife, and a disposition to do as much as he could to throw obstacles in her way, and prevent her getting what belonged to her. He made no answer to the bill in this case, and while this may have been because he did not regard his interest as of any value, it is, after all, when considered among the other facts, of some significance. Shier, who answered, did nothing

beyond denying generally the whole bill, and did not attempt to explain the consideration or equities of the mortgage. This, too, he had a right to do; but it is not common for a defendant charged with fraud to content himself with such an answer. Of course, this left the complainant to prove the fraud; but, upon doubtful facts, which it became important for the defense to explain, all the conduct of parties may have some bearing.

The only parties who presumptively knew all about the mortgage were Eaton and Shier. Eaton was not called as a witness, and there is an entire absence of testimony concerning the custody and handling of the mortgage during an interval after its date. It was drawn by Eaton, and the acknowledging officer knew nothing about the circumstances beyond the acknowledgment. Shier's testimony is all that we have on the subject, and his account is substantially this: On Saturday, two days before the mortgage was dated, Eaton came out to visit him. On Monday they had some talk about Miss Eaton's board, the subject being introduced by Eaton, who proposed to give security on three lots in Detroit. Up to this time there had never been any talk on the subject between them, and no board had ever been paid or asked for. Up to this time Mr. Shier had never thought of or fixed any price. He says that at the time Eaton made out the mortgage he asked the price. Shier told him the price of board was from four to five dollars a week, without washing, lights, or wood, and he says he furnished her with wood. It was finally agreed that Eaton would allow him five dollars a week. Shier did not see the note and mortgage after its execution until his wife gave it to him after it was returned recorded. She was not sworn, and her conversations, being hearsay, were not evidence.

This is the only explanation given. There are several collateral facts bearing strongly on Eaton's disposition to defraud his wife, and apart from his admission by not answering, we cannot resist the belief that his intention was to hinder and defraud her in collecting her debt.

It is further manifest that the mortgage was never asked

or desired by Shier, and that he was passive in the arrangement, and that Eaton fixed both the amount and terms as he pleased. From all the circumstances, and from Shier's own showing, it is highly improbable that, if he expected to charge Miss Eaton for board, he would have made any such charge as he did. The terms on which she lived in the family, and the nature and extent of her accommodations, render it unlikely that any such price as five dollars would have been charged or expected as a reasonable transaction. Whatever may have been his expectation of pay from somebody, or on some terms, it is clear that this arrangement was not one which he pressed or cared for. There is no proof that it was an ordinary price for such board, to inmates who did or did not live in such intimate family relations. It is evident that the whole matter was one in which Shier simply allowed Eaton to do as he pleased, and that he gave no credit and built no reliance on the mortgage.

It seems to us plain from the testimony that it was given to subserve Eaton's purposes, and not Shier's, and should be so regarded. There is no pretense that if it had not been given it would have made any difference with Shier; and while it may be that security thus given to secure a debt of undoubted obligation and validity may sometimes be maintained, if honestly given, it would be going very far to hold that a mortgage intended for a fraudulent purpose, voluntarily given and not asked for, to secure a debt which had never been regarded as a debt, and was allowed to be fixed at an unreasonably large rate by the debtor himself, can be maintained against the party intended to be defrauded.

We think the decree should be reversed, and that the relief asked should be granted.

MORSE and SHERWOOD, JJ., concurred.

CHAMPLIN, J., did not sit.